GARY M. RESTAINO
United States Attorney
District of Arizona
MICHAEL A. AMBRI
Assistant U.S. Attorney
Arizona State Bar No. 021653
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone: (520) 620-7449
Email: michael.ambri@usdoj.gov
*Attorneys for Defendant*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| William Anthony Fly,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>M. Diaz, et al.,<br><br>　　　　　Defendants. | CV-21-00506-TUC-SHR<br><br>**RESPONSE IN OPPOSITION<br>TO PLAINTIFF'S MOTION<br>FOR PRELIMINARY INJUNCTION** |

Pursuant to the Court's Order dated April 14, 2022 (Doc. 15), Defendant Danon Colbert, in his official capacity as Acting Warden of the United States Penitentiary, Tucson, ("USP Tucson") hereby responds in opposition to Petitioner's motion for preliminary injunction (Doc. 14).[1]  First, injunctive relief is unavailable in this *Bivens* action.  Second, in all events, Plaintiff has not and cannot establish the *Winter* elements necessary for the extraordinary and far-reaching injunctive relief she seeks.  Contrary to Plaintiff's hyperbole, Plaintiff has not been subjected to "torture" or sexual assaults by staff; her victimization risk and placement have been evaluated and determined to be

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Acting Warden Danon Colbert is substituted for former Warden Catricia Howard.  The BOP employees named in this action in their individual capacities do not enter an appearance yet because DOJ representation of them has not been established in time for this expedited response.  However, the individually named defendants have provided Declarations supporting this response, and the response addresses the allegations as they relate to the individually named defendants.

appropriate; her medical and mental health matters have been and continue to be assessed with action taken in the professional judgment of her medical providers and within BOP guidelines; her mail, email, telephone and visitation privileges have not been unduly restricted. Plaintiff's accusations are insufficient to set aside the judgment of BOP and Plaintiff's medical and mental health providers. Defendant requests that the motion be denied. This response is supported by the Declarations of L. Apodaca and Defendants Campbell, Christiansen, Pierce, Vasquez, Gutierrez and Wade, and attachments thereto.

**I.    PLAINTIFF'S CLAIMS AND MOTION.**

This is an action by a federal inmate under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388 (1971). Plaintiff is serving a 120-month sentence on a conviction in the District of North Dakota for Transportation with Intent to Engage in Criminal Sexual Activity (18 U.S.C. § 24221(a)). His projected release date is August 12, 2025. He has been incarcerated at USP Tucson since October 14, 2021.

The nine-count Amended Complaint named some 35 BOP employees or former employees, including USP Tucson and FCI Florence, Colorado, wardens, lieutenants, correctional officers, health services administrator, psychologists, physicians, physicians assistants, and nurses, as well as executives of BOP National Inmate Appeals Administration, National Prison Rape Elimination Act ("PREA") office, Women and Special Populations Branch, Designation and Sentencing Computation Center, and Transgender Executive Council. *See* Doc. 9.

On screening under 28 U.S.C. § 1915(a), the Court dismissed all claims and defendants except Count 1 (Eighth Amendment excessive force and sexual assault) against USP Tucson Lieutenants Campbell, Christiansen and Pierce and Correctional Officer Vasquez in their individual capacities; Count 3 (Eighth Amendment threat to safety) against USP Tucson Correctional Officers Vasquez, Gutierrez and Wade in their individual capacities; and Count 5 (Fifth Amendment Equal Protection) against USP Tucson Warden Howard in her official capacity. *See* Doc. 15. The Court denied Plaintiff's motion for temporary restraining order (Doc. 15 at 25) and ordered a response to Plaintiff's motion

for preliminary injunction within 10 days after service of Defendants (*id.* at 29).

For Count 1 (Eighth Amendment excessive force and sexual assault), Plaintiff alleges that, on October 29, 2021, while Plaintiff was escorted in leg and arm restraints, Defendants Campbell, Christiansen and Vasquez used excessive force against her by "torturing" her in a restraint chair. (Doc. 5 at 8.) According to Plaintiff, Defendant Campbell "ordered his staff to violently assault" Plaintiff and drop her on the floor, then ordered a restraint chain for Plaintiff's waist, which was "wrapped violently" around her and cut into her breasts. Plaintiff claims this "deprive[d] her of her womanhood." According to Plaintiff, Defendant Campbell then took Plaintiff to the "torture chamber," where Campbell, Christiansen and Vasquez violently sexually abused, mutilated, and harassed Plaintiff, inflicting excruciating pain and a "lingering death" upon her, allegedly causing her severe nerve pain and damage, a broken hand and wrist, and stress fractures. Plaintiff alleges she repeatedly told Campbell, Christiansen and Vasquez the restraints were too tight and painful, and were cutting into her; she was having difficulty breathing due to her asthma; her blood flow to her extremities "ceased" due to her Raynaud's disease; and she could "lose life or limb." According to Plaintiff, Defendant Vasquez told her, "You deserve to die …" and "you deserve to lose your hands," Defendants Campbell, Christiansen and Pierce told her the restraints were "supposed to hurt," and Defendant Campbell told her that she is "still a man." According to Plaintiff, she was "left to burn in pepper spray" and she suffered scarring to her breasts, chest, back, arms, wrists, hands, legs, buttocks, and ankles; excruciating pain; severe nerve pain and damage; and severe emotional distress, suicidal ideation, and "prayers for death."

For Count 3 (Eighth Amendment threat to safety), Plaintiff alleges that, on November 26, 2021, Defendants Vasquez, Gutierrez, and Wade failed to protect her from imminent threat of harm when she was assaulted by inmate Bryson Knobeloch (also known as Olivia Knobeloch), Plaintiff's former co-plaintiff in this case.[2] Plaintiff alleges she

---

[2] The original Complaint filed December 6, 2021, ten days after this alleged assault by Knobeloch, had both Plaintiff and Knobloch as the plaintiffs. Doc. 1. Fly and

repeatedly pressed the emergency duress button and yelled at staff to come to her cell in the SHU. Plaintiff asserts other prisoners also called for help, and Defendants Vasquez, Gutierrez and Wade came to her cell door and said, "We didn't see it, we have to see it first." Plaintiff alleges she was bleeding severely from her ear. According to Plaintiff, Vasquez, Gutierrez and Wade "insisted" Plaintiff and Knobeloch fight, watched Knobeloch "beat [Plaintiff] more," and "made fun of Plaintiff for saying, 'no baby, no baby, no.'" According to Plaintiff, they encouraged Plaintiff to beat up Knobeloch. Plaintiff further alleges that several providers had recommended placement in a single cell to prevent assaults by other prisoners and "self[-]directed violence" due to rape trauma syndrome, anxiety, and transgender status. Plaintiff also alleges Defendants intentionally misgendered her, called her a sexual slur and "Mister," and revealed Plaintiff's "charged offenses" and transgender status to incite prisoner violence upon her.

For Count 5 (Fifth Amendment Equal Protection), Plaintiff alleges she has been denied her rights to be free from discrimination based on her transgender status. She alleges that from July 15, 2016, through the present, Defendants have treated her differently and placed her in jeopardy of forced sexual abuse, sexual and physical assault, sexual harassment, and rape; and have denied her medical treatment, access to administrative remedies and the courts, due process, equal protection, and life, liberty, and security in her person solely because of her transgender status. Plaintiff alleges she is denied medical care and a safe housing assignment at a female facility because she is transgender. Plaintiff asserts Defendant Howard told Plaintiff she would never recommend "a transgender for placement in a female institution." Plaintiff claims an unnamed Unit Manager told Plaintiff because she was "a woman in a male institution," she would "continue to be raped." Plaintiff claims she is continuously, intentionally misgendered to inflict emotional distress, self-harm, and suicidal ideation. She alleges she is denied medically necessary social role transition therapy, including gender affirming surgery, as well as assignment to a female

---

Knobeloch each filed separate Complaints with both of them as plaintiffs. The Clerk opened two civil cases – one for each Complaint (21-cv-00505 and 21-cv-00506). The Court dismissed Plaintiff Knobeloch from this action.

facility for her health and safety. Plaintiff further alleges she has been denied her religious observance as a "two spirit Native American Jew" due to being transgender.

The motion for preliminary injunction (Doc. 14) seeks a host of injunctive relief. Plaintiff seeks an order (1) requiring BOP to provide Plaintiff with immediate gender confirmation surgeries; (2) requiring BOP to provide Plaintiff with gender affirming medical treatments; (3) requiring BOP to provide Plaintiff with medical accommodations; (4) requiring BOP to provide Plaintiff with "social role" transition therapy; (5) barring BOP from ever placing Plaintiff in the Special Housing Unit ("SHU"), Special Management Unit ("SMU"), Maximum Security Prison in Florence, Colorado ("ADX"), or in any United States Penitentiary, Federal Correctional Institution or other facility for male prisoners; (6) requiring that BOP transfer Plaintiff to a female facility; (7) requiring BOP to house Plaintiff without a cellmate; (8) requiring BOP to keep Plaintiff separate from all male prisoners and staff; (9) requiring BOP to "stop obstructing" Plaintiff's mail, email, telephone and visitation privileges; and (10) requiring Defendants to cease their alleged sexual abuse, harassment, mutilation and rape of Plaintiff.

## II.   FACTS RELATED TO PLAINTIFF'S CLAIMS.

**Excessive Force, Sexual Assaults and Threat to Safety.**

Defendants deny Plaintiff's allegations of excessive force, sexual assaults and threats to safety. As confirmed in the Declarations of Defendants Campbell, Christiansen, Pierce, Vasquez, Gutierrez and Wade, attached hereto as Exhibits A-F, the events described by Plaintiff did not occur. To summarize, Defendants confirm they have not "tortured" or physically or verbally abused Plaintiff, they have not sexually assaulted or "mutilated" Plaintiff, they were notified of no assault by Knobeloch upon Plaintiff and they did not pit Knobeloch and Plaintiff against each other to fight, they did not unreasonably restrain Plaintiff, they have not circulated Plaintiff's personal information to other inmates to put Plaintiff in jeopardy or otherwise, and Defendants are aware of no harm to Plaintiff.

On October 29, 2021, when Plaintiff alleges she was placed in the "torture chair" and sexually assaulted and "mutilated" by Defendants Campbell, Christiansen and

Vasquez, Plaintiff was placed in a restraint chair for security and safety due to her behavior. *See* Ex. A at ¶ 3 and Att. 1 thereto. Contrary to Plaintiff's characterization, Plaintiff received multiple wellness checks at multiple times by health staff while she was restrained. *Id.* at ¶ 6; *see also* Att. 3 to Ex. G, at pp. 41-63. Throughout, the medical providers judged that Plaintiff "appears well," with no distress and no injuries, with "no complaints, only demanding to be let out of the chair." Att. 3 to Exhibit G, at pp. 41-63. The restraints were at all times "tight enough for security but loose enough to allow for less than 3 second cap refill to all extremities and adequate pulses to all four extremities." *Id.* Plaintiff was offered food and water, which she refused. Ex. A at ¶ 3 and Att. 1 thereto; *see also* Att. 3 to Ex. G at p. 55. When she was released from the restraints, medical providers found none of the injuries Plaintiff complains of now. Att. 3 to Ex. G, at pp. 41-42. It was nearly one month later, on November 24, 2021, when Plaintiff went to Health Services to complain about the alleged events of October 29, 2021. Att. 3 to Ex. G, at pp. 31-35. At Health Services at that time, she complained that the officers had groped her breasts when they were putting her in restraints and the officers pulled the chains too tight. *Id.* at 31. She confirmed at that time that she was not touched sexually other than what she described as a grope. *Id.* Plaintiff was examined and released with instructions to follow up at sick call as needed. *Id.* at 34. There is no medical record at any time in which Plaintiff complained of, or was treated for or diagnosed with, the broken hand and wrist and fractures she alleges here. *See* Att. 3 to Ex. G.

Similarly, there is no record of Plaintiff coming to Health Services for any injuries on or immediately after November 26, 2021, when Plaintiff alleges she was "bleeding severely from her ear" due to the alleged assault by Knobeloch and alleged related acts of Defendants Vasquez, Gutierrez and Wade. *See* Att. 3 to Exhibit G. The one and only medical record from that day reflects that, at 5:43 p.m., Plaintiff came to Health Services and requested that her mometasone inhaler be placed on self-carry like her albuterol. *See* Att. 3 to Exhibit G at pp. 29-30. Plaintiff's next visit to Health Services after November 26, 2021, was on December 11, 2021, when Plaintiff reported having secondary contact

1  with pepper spray as a bystander to an inmate incident.  She was evaluated and released
2  with no treatment needed.  *Id.* at pp. 25-28.  Plaintiff denied any other injuries or
3  complaints.  *Id.*  Though the Complaint alleges the events involving Knobeloch and
4  Defendants Vasquez, Gutierrez and Wade occurred on November 26, 2021, Plaintiff's
5  declaration alleges the events occurred on November 4, 2021. Doc. 14-2 at ¶ 11.  There is
6  no record of any contact with Health Services on or several days after November 4, 2021.
7  *See* Att. 3 to Exhibit G.  The next record in Plaintiff's medical file after November 4, 2021,
8  is an administrative note on November 17, 2021, at which time Plaintiff's hormone
9  medications were continued.  *Id.* at pp. 39-40.
10           As reflected in Plaintiff's psychology records, Plaintiff "has an extensive history of
11  using provocative language to describe her immediate surroundings and living conditions
12  to include words and phrases such as 'torture' and 'deliberate indifference to safety.'"  *See*
13  Doc. 14-1 at p. 4.  The records further describe that Plaintiff "has also misused the word
14  'rape' in situations where she is denied staff assistance and has accused staff of coercing
15  [her] into 'sexual servitude' in situations where she is denied access to tangible items (*i.e.,*
16  stamps)."  *Id.*  Plaintiff also has "acknowledged misusing threats of self-harm in order to
17  alter the conditions of her confinement, or more specifically to avoid SHU placement." *Id.*
18           Since coming to USP Tucson on October 14, 2021, Plaintiff has initiated three
19  Prison Rape Elimination Act ("PREA") investigations.  All three were investigated and
20  found to be unsubstantiated.  In one complaint, arising from events at a different BOP
21  institution prior to Plaintiff coming to USP Tucson, Plaintiff reported that, on October 14,
22  2021, while at the Federal Transfer Center in Oklahoma City, an inmate masturbated at
23  her.  In that same report, Plaintiff alleged a correctional officer touched her inner thigh
24  during a pat down search.  In the second PREA complaint, Plaintiff alleged an inmate raped
25  her at various times between December 21, 2021, and December 29, 2021.  The inmate
26  was interviewed and indicated she had consensual sex with Plaintiff on Plaintiff's initiative.
27  Inmates in the two surrounding cells were interviewed and indicated they did not hear
28  anything that would suggest a sexual assault.  Plaintiff had no injuries, and surveillance

video did not indicate that a sexual assault had occurred. Plaintiff was taken to an outside hospital for a forensics examination but, upon arrival, Plaintiff refused to allow an examination. On January 19, 2022, Plaintiff filed a PREA complaint against five inmates. Plaintiff alleged no physical assaults but instead accused all five of verbal harassment. All of the accused inmates denied the allegations. *See* Exhibit G at ¶¶ 34-37.

**Risk and Placement Assessments.**

Plaintiff's risk of sexual victimization and placement within BOP have been fully evaluated per BOP policy, and have been determined to be appropriate. BOP follows an extensive procedure for determining an inmate's risk and placement, applied here to Plaintiff's designation to USP Tucson and housing assignment. Exhibit G at ¶¶ 9-23.

BOP institutions are classified into one of five security levels: Minimum, Low, Medium, High, and Administrative, based on the level of security and staff supervision the institution is able to provide. USP Tucson is the only High-Security facility that operates a Sex Offender Management Program ("SOMP"), established to assist in the effective management and treatment of the BOP's population of sexual offenders (like Plaintiff) and to provide services that minimize this population's risk for sexual re-offense. A primary goal of a Sex Offender Management Program is to maintain a significant proportion of sexual offenders in the institution, so as to reduce the need to place sexual offenders in protective custody. *See* Exhibit G at ¶ 9.

BOP inmates are assigned to an institution based, primarily, upon the level of security and supervision the inmate needs, the level of security and staff supervision the institution can provide, and the inmate's program needs (i.e., substance abuse treatment, education, counseling, medical or mental health treatment). The Bureau of Prisons also considers other factors in assigning an institution, such as: the inmate's release residence; the level of overcrowding at an institution; additional security measures to protect the inmate, victims or witnesses, or the general public; and, any other relevant factor that may impact the inmate's confinement, the protection of society, or the safe and orderly management of a Bureau of Prisons facility. *See* Exhibit G at ¶ 10.

BOP Designation and Sentence Computation Center ("DSCC") officials gather and assess information from the sentencing court, the U.S. Marshals Service, the U.S. Attorney's Office and the U.S. Probation Office, then enter the information into the SENTRY database, to generate an initial security point score for the inmate. The point score is then matched with a commensurate security level institution, taking into consideration other relevant designation factors. The SENTRY system does not identify a specific institution – designation officials make an individualized determination, based on various factors, such as the inmate's background and characteristics, any medical issues, and prison overcrowding concerns. *See* Exhibit G at ¶ 11.

When a designation is made, DSCC staff forward all the supporting documents to the institution, where the Case Management Coordinator reviews the materials to determine whether there are any institution-specific concerns regarding the proposed designation. If the Case Management Coordinator identifies a scoring error or has other concerns, the inmate may be redesignated at the discretion of the DSCC. Inmate transfers follow a similar process, but also take into consideration the inmate's institutional adjustment and program performance at his or her current institution. *See* Ex. G at ¶ 12.

BOP institution staff screen newly arrived inmates, whether the inmate is a new commitment, a transfer from another institution, a return from a court appearance or a writ, or a holdover. The intake screening process helps ensure that health, safety and security standards are met before the inmate is placed in general population. *See* Exhibit G at ¶ 13.

The screening process includes an interview by a trained staff member, who reviews relevant records, such as the inmate Central File, Presentence Investigation Report, and other available documentation, to determine whether the inmate is suitable for placement in the general population. The BOP SENTRY database generates an Intake Screening form for the inmate, which provides important information about the inmate's Central Inmate Monitoring status and identifies any separatees at the institution. This allows staff to ensure the inmate will not be placed in the same institution as another inmate from whom he or she should be separated. The interviewer will consider whether the inmate was a victim or

perpetrator of sexual assault, the inmate's history of violence, whether or not the inmate has testified in court, and other such elements that relate to an inmates ability to safely reside in an institution's general population. *See* Exhibit G at ¶ 14.

All inmates receive a screening for risk of sexual victimization and abusiveness, which is used to inform housing, bed, work, education and program assignments, with the goal of keeping separate those inmates of high risk of being sexually victimized from those at high risk of being sexually abusive. Staff make an individualized determination about how to ensure inmates' safety. When an inmate identifies as transgender, staff consider the inmate's own views as to his or her own safety, but BOP is not permitted to place transgender inmates in dedicated facilities, units, or wings solely on the basis of the inmates' status or self-identification. *See* Exhibit G at ¶ 15.

After the formal intake screening process, institution Special Investigative Service staff interview the new inmate to ensure there is no non-medical reason for the inmate not to be released to the general population. Special Investigative staff are familiar with the facility and are able to determine whether an inmate's stated or reported affiliations are likely to put him or her at risk in the general population. *See* Exhibit G at ¶ 16.

In all screening decisions, staff consider a number of factors that impact placement, including the credibility of the information the inmate provides as compared to information contained in the documentation, the allocation of staff and bed space resources at the institution, and the staff member's correctional judgment as to the appropriate housing status for the inmate. *See* Exhibit G at ¶ 17. An inmate may be placed in administrative detention status for protective custody if the inmate is a victim of an assault or is being threatened by other inmates, if the inmate is threatened because he or she is perceived to have provided information or assistance to staff or law enforcement authorities, if the inmate refuses to enter the general population because of concerns for his or her safety, or if staff believe the inmate believe the inmate's safety may be jeopardized. Whenever an inmate is placed in protective custody, staff conduct an investigation to verify the reason for the placement. If the need for protective custody is verified, the inmate will remain in

such custody or be transferred to an institution where protective custody may not be necessary. If the staff investigation fails to verify the need for protective custody, the inmate will be returned to the general population. *See* Exhibit G at ¶ 18.

Investigating staff weigh information from a number of sources in determining the validity of an alleged threat and how to respond to the threat. Such factors include the source and credibility of the information at the staff members' disposal, the resources available to address credible threats, and the rights of inmates at the institution. Policy does not dictate a particular response; it affords the officials discretion to exercise correctional judgment in evaluating and responding to an alleged threat. *See* Ex. G at ¶ 19.

The result of Plaintiff's placement and risk assessment is that Plaintiff has been designated to USP Tucson's Sex Offender Management Program. Her risk of sexual victimization has been evaluated and determined to be moderate, allowing her to be in general population and to have cell mates with low risk of sexual abusiveness. Currently, psychology staff recommend that Plaintiff have a cellmate – in the judgment of psychology staff, having a single cell is not necessary or appropriate for Plaintiff at this time. Plaintiff's placement at USP Tucson is consistent with her risk assessment. In BOP's judgment, Plaintiff is assigned to an appropriate general population housing unit based on her sexual victimization intake screening. Though Plaintiff often demands a single cell, Plaintiff's providers recommend that she be paired with a cellmate, based on Plaintiff's history and needs. In their judgment, there is no basis to conclude that Plaintiff is being incorrectly or inappropriately housed. Exhibit G at ¶ 20-23.

**Hormone Therapy.**

Contrary to Plaintiff's vague allegations, Plaintiff has received and continues to receive feminizing hormone therapy. Throughout her time at USP Tucson, Plaintiff has been prescribed Estriol and Spironolactone to reduce testosterone and increase estrogen. Plaintiff has received blood tests to monitor her hormone levels. Her prescriptions have been continuously refilled and remain active. Exhibit G at ¶ 24.

**Female Facility, Gender Reassignment Surgery.**

Whether a transgender female inmate is housed in a female institution and receives gender affirming surgery are highly individualized determinations involving medical and mental health analysis and a number of qualifying criteria. At this time, Plaintiff does not qualify to be housed in a female facility or for gender affirming surgery. Exhibit G at ¶ 26.

BOP medical staff provide medically necessary care to transgender inmates, including hormone or other necessary medical treatments, after an individualized assessment. Staff develop a treatment plan which promotes the inmate's physical and mental stability. BOP's clinical guidelines provide that treatment is designed to reduce characteristics of the natal sex and induce those of the identified gender, so that individuals may project their identified gender. Individualized care allows for transition through education, counseling, real-life experience, medical evaluation, hormone treatment, and in some cases, sex reassignment surgery. Exhibit G at ¶ 27.

Gender-affirming surgery is considered on a case-by-case basis because some transgender individuals live successfully without surgery, while others need it. The clinical standards do not advocate gender-affirming surgery for all people. When considering gender-affirming surgery, BOP considers whether an inmate demonstrates at least 12 months of successful use of hormone therapy, participation in psychotherapy as clinically indicated, full-time real life experience in their preferred gender, and consolidation of gender identity. The inmate is required to demonstrate via informed consent a practical understanding of gender-affirming surgery including, but not limited to, permanence, potential complications, and short and long-term treatment plans. The clinical guidelines require documentation of persistent gender dysphoria by a qualified mental health provider. Providers also look for a target testosterone level of below 55 ng/dl. Exhibit G at ¶ 28.

In the incarceration context, twelve months of full-time real life experience in the preferred gender includes 12 months in a female institution. BOP does not consider gender-affirming surgery for transgender females until after successful re-designation to a female institution for twelve months. Because prisons are segregated by sex, transgender

individuals cannot fully experience their gender in reference to same-gender peers without this experience. Not all transgender women adapt successfully to female prisons. Some transgender women have behaved in ways that made it unsafe to maintain them in a female prison and have had to return to a male prison. Others have requested to return to a male prison. Therefore, the experience of living in a prison consistent with an individual's gender identity is a critical step in the transition process. It is critical to know before irreversible surgery if a transgender woman is not able to live in a female prison or does not wish to continue in that setting. Exhibit G at ¶ 29.

Achieving target hormone levels is a first step for transgender women to move to a female facility. When transgender women maintain their target hormone levels, they become more feminine in appearance. They also lose muscle mass, experience lower libido, and are not able to maintain erections. All of these feminizing effects are important for transgender female inmates to be able to live in a female institution and for the safety of the women who would be their peers at the institution. Exhibit G at 30.

BOP policy provides that BOP make individualized decisions about transgender inmate housing, considering, among other factors, gender identity, the safety of all parties, and inmate behavior and history. This ensures the needs of transgender inmates are addressed and safety is maximized for all inmates. BOP policy allows designation to a facility of the inmate's identified gender after consideration of all of the factors and where there has been significant progress toward transition as demonstrated by medical and mental health history, as well as positive institution adjustments. Exhibit G at 31.

When an inmate has satisfied the criteria for gender-affirming surgery, requests for surgery are transmitted to BOP's Transgender Clinical Care Team ("TCCT"),[3] which makes a recommendation to BOP's Medical Director, who is the approving authority. The Medical Director has sole authority to approve gender-affirming surgery. *Id.* at 32.

At this time, for a number of reasons, Plaintiff does not qualify for gender

---

[3] The TCCT is a multidisciplinary group of BOP personnel with transgender subject matter expertise. The team provides assistance to institution staff and develops clinical treatment recommendations for the BOP transgender population. Ex. G at ¶ 32.

reassignment surgery or placement in a female facility. Plaintiff has been screened at USP Tucson for gender dysphoria and has not received a diagnosis of gender dysphoria. Plaintiff has been housed solely in male facilities since being incarcerated with BOP -- she has not lived in a gender-affirming role for twelve months. Plaintiff is appropriately being housed in USP Tucson based on no existing diagnosis of gender dysphoria, Plaintiff's criminal history, Plaintiff's mental health problems, recent disciplinary convictions and hormone levels that are inconsistent with gender transition. Despite hormone therapy, her hormone levels are not yet within the target range for transfer to a female facility; she has had testosterone levels far in excess of the target 55 ng/dl. Plaintiff has recent disciplinary issues. Plaintiff has recent disciplinary convictions. Plaintiff's has ongoing mental health needs and instability. These factors make it inadvisable to place Plaintiff in a female facility and submit Plaintiff for gender affirming surgery. Exhibit G at ¶¶ 33-35.

Plaintiff's Presentence Investigation Report provides further insights in connection with the BOP psychology records and provider's analysis. *See* Att. 6 to Exhibit G.

**Mail, Visitation, Telephone Privileges.**

Plaintiff's access to TRULINCS (email) is restricted because she was convicted of a crime that falls under the Adam Walsh Act. Inmates with similar convictions to Plaintiff are given the same restrictions. On December 15, 2021, Plaintiff was disciplined for threatening to stab someone. As a disciplinary sanction, Plaintiff lost visitation privileges until March 17, 2022, and telephone privileges until June 24, 2022. Currently, there are no visitation restrictions placed on Plaintiff and Plaintiff's telephone restrictions are set to be lifted next month. *Id.* Plaintiff has no mail restrictions other than those that are applicable to all inmates – incoming mail is checked and if it contains contraband it is subject to seizure. Exhibit G at ¶ 36; *see also* 28 C.F.R. § 540.14.

**III.   STANDARDS FOR PRELIMINARY INJUNCTION.**

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion.'" *Lopez v. Brewer,* 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong,* 520

U.S. 968, 972 (1997) (per curiam)) (emphasis added); *see also Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 24 (2008) (citation omitted) ("[A] preliminary injunction is an extraordinary remedy never awarded as of right."). Whether for a temporary restraining order or a preliminary injunction, the test is the same. *White v. Lindermen,* No. CV 11-8152-PCT-RCB, 2012 WL 5040850, at *1 (D. Ariz. Oct. 18, 2012) (citations omitted).

A plaintiff seeking preliminary injunctive relief must show (1) she is likely to succeed on the merits, (2) she is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in her favor, and (4) the requested injunction is in the public interest. *Fuller v. Granville,* No. CV 14-0020-PHX-DGC, 2014WL4541122, at *6 (D. Ariz. Sept. 12, 2014) (citing *Winter,* 555 U.S. at 20). Alternatively, the plaintiff may establish "serious questions going to the merits" – something less than a likelihood of success on the merits – but only if the plaintiff also establishes that the "balance of hardships tips sharply in the plaintiff's favor" and the other two elements of the *Winter* test are met. *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1135 (9th Cir. 2011). Under the "serious questions" test, the plaintiff must make a stronger showing of one element to offset a weaker showing of another. *Id.* Whichever formulation of the standard is applied, the movant has the burden of proof on each element of the test. *Environmental. Council of Sacramento v. Slater,* 184 F. Supp. 2d 1016, 1027 (E.D. Calif. 2000).

Further, a preliminary injunction is "merely to preserve the relative position of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch,* 451 U.S. 390, 395 (1981). Thus, "there is a heightened burden where a plaintiff seeks a mandatory preliminary injunction (one that would alter the status quo), which should not be granted 'unless the facts and law clearly favor the plaintiff.'" *White,* 2012 WL 5040850, at *1 (quoting *Comm. of Cent. Am. Refugees v. INS,* 795 F.2d 1434, 1441 (9th Cir. 1986)).

The Prison Litigation Reform Act ("PLRA") imposes yet further requirements on a prisoner who seeks injunctive relief. The PLRA requires that any injunctive relief be *narrowly drawn* and the *least intrusive means* necessary to correct the harm. 18 U.S.C. § 3626(a)(2); *Gilmore v. People of the State of Calif.,* 220 F.3d 987, 999 (9th Cir. 2000).

Under the PLRA, "[t]he court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." 18 U.S.C. § 3626(a)(2). Courts recognize that, "because the problems of prisons in America are complex and intractable, and because courts are particularly ill equipped to deal with these problems, [courts] generally have deferred to the judgments of prison officials. ..." *Shaw v. Murphy,* 532 U.S. 223, 229 (2001) (internal quote marks and citation omitted).

## IV. INJUNCTIVE RELIEF IS UNAVAILABLE.

To the extent Plaintiff seeks injunctive relief against the individually named defendants pursuant to *Bivens,* no such relief is available. A *Bivens* lawsuit is an individual capacity lawsuit for damages. *Solida v. McKelvey,* 820 F.3d 1090 (9th Cir. 2016). Injunctive relief is not available in a *Bivens* action. *Id.* at 1094 ("By definition, *Bivens* suits are individual capacity suits and thus cannot enjoin official governmental action.").

Further, an official capacity suit is barred by sovereign immunity. A *Bivens* action is not a "vehicle for altering an entity's policy." *Corr. Servs. Corp. v. Malesko,* 534 U.S. 61, 74 (2001). The Ninth Circuit has made it clear that a Bivens action cannot be brought against a defendant acting in his official capacity because the United States has not consented to its officials being sued in their official capacity. *See Consejo de Desarrollo Economico de Mexicali, A.C. v. United States,* 482 F.3d 1157, 1173 (9th Cir. 2007). Rather, Bivens is solely a means of obtaining damages against defendants in their individual capacities. *See id.* As held in *Consejo,* a Bivens suit against a defendant in his or her official capacity is an inappropriate attempt to bring an action against the United States that is barred by sovereign immunity. *See id.*

## V. PLAINTIFF DOES NOT ESTABLISH THE *WINTER* FACTORS.

Plaintiff seeks extraordinary affirmative injunctive relief overriding the policies and determinations of BOP and Plaintiff's medical providers, going so far as impose prior restraint on BOP's exercise of correctional judgment in determining Plaintiff's placement within BOP, contrary to 18 U.S.C. § 3621 which vests BOP with sole discretion in such matters. Far from the required "clear showing" and heightened standard for such

affirmative relief altering the status quo, Plaintiff does not even address the *Winter* factors. The motion should be denied for this reason alone. *See Fuller v. Granville,* No. CV 14-0020-PHX-DGC J, 2014 WL 4541122, at *6 (D. Ariz. Sept. 12, 2014) (denying preliminary injunction where Plaintiff failed to address each element of the test); *see also Olmos v. Ryan,* No. 10-2564-PHX-GMS-MEA, 2012 WL 177859, at * 3 (D. Ariz. Jan. 23, 2012) (same). Further, the *Winter* factors all point against preliminary injunctive relief.

Plaintiff does not establish a likelihood of success or serious questions going to the merits. The evidence contradicts Plaintiff's bald accusations. The great weight of the evidence shows that, contrary to Plaintiff's characteristic hyperbole, Plaintiff is not being tortured and sexually assaulted by staff, that Plaintiff has not been put at risk of imminent harm, that Plaintiff's placement at and within USP Tucson has been evaluated and is appropriate, that Plaintiff is receiving hormone therapy under medical supervision, that, for the benefit of Plaintiff and the safety and security of other inmates, Plaintiff is not eligible to be placed in a female facility at this time, that gender re-assignment surgery is not medically indicated at this time, and that Plaintiff is not being subjected to undue restrictions on his mail, visitation and telephone privileges. Any relief concerning Plaintiff's designation to USP Tucson further lacks a likelihood of success on the merits because, as noted above, BOP's placement decisions are not subject to judicial review. 18 U.S.C. § 3621(b)(5) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court.").

Nor is there irreparable harm. A plaintiff "must demonstrate that there exists a significant threat of irreparable injury." *Oakland Tribune, Inc. v. Chronicle Publishing Co.,* 762 F.2d 1374, 1376 (9th Cir. 1985). The irreparable injury must be both likely and immediate. *Winter,* 555 U.S. at 24. Mere "[s]peculative injury does not constitute irreparable injury to warrant granting a preliminary injunction." *Caribbean Marine Servs. Co. v. Baldrige,* 844 F.2d 668, 674 (9th Cir. 1988). Again, the evidence shows that Plaintiff has not suffered and will not suffer the harms he alleges, and his safety, housing, disciplinary, medical and mental health issues have been fully evaluated and addressed per

1 | BOP policy and the professional judgment of BOP and his health providers.

2 |     The equities and public policy favor upholding BOP's correctional decisions and health providers' judgment. The evidence establishes no grounds for the extraordinary measure of overriding the professional judgment of BOP and Plaintiff's health providers, or of placing any restrictions on BOP's ability to make housing, safety, health, disciplinary and security determinations with respect to Plaintiff. All actions and determinations of BOP have been, and are, consistent with BOP policy and the standards applicable to the complex matter of managing and serving the needs of transgender inmates in the correctional environment. Plaintiff's effort to override those decisions should be rejected.

## VI. REQUEST FOR HEARING.

It is Plaintiff's burden to establish entitlement to injunctive relief, which she has failed to do. However, in the event further evidence or information are needed for the denial of Plaintiff's motion, Defendants request an evidentiary hearing.

## VII. CONCLUSION.

For the foregoing reasons, Defendant requests that the motion for preliminary injunction (Doc. 14) be denied.

RESPECTUFLLY SUBMITTED this 23rd day of May, 2022.

    GARY M. RESTAINO
    United States Attorney
    District of Arizona

    */s/ Michael A. Ambri*
    MICHAEL A. AMBRI
    Assistant U.S. Attorney

Copy of the foregoing served by first class U.S. mail this 24th day of May, 2022, to:

William Anthony Fly
Reg. No. 18658-023
U.S.P. Tucson
P.O. Box 24550
Tucson, AZ 85734

*/s/ Michael Ambri*